UNITED STATES of America

v.

Chaka FATTAH, Sr., et al.

CRIMINAL ACTION NO. 15-346

United States District Court,
E.D. Pennsylvania.

Signed June 7, 2016

Paul L. Gray, U.S. Attorney's Office, Philadelphia, PA, for United States of America.

## MEMORANDUM CONCERNING THE ADMISSION OF CERTAIN EVIDENCE AT TRIAL

Bartle, District Judge.

The Government prior to trial filed a motion in limine in this criminal action to admit into evidence a recorded telephone

conversation of Renee Chenault-Fattah ("Chenault-Fattah"), the wife of defendant Chaka Fattah, Sr. ("Fattah"), with a representative of their automobile insurance company. The court granted the motion orally on the record during the trial and now sets forth its reasons in greater detail.

The twenty-eight count indictment in this action charges defendant Fattah, a member of Congress from Pennsylvania's Second Congressional District, as well as defendants Herbert Vederman ("Vederman"), Robert Brand, Karen Nicholas and Bonnie Bowser ("Bowser"), with various crimes including conspiracy to commit racketeering, wire fraud conspiracy, conspiracy to commit honest services wire fraud, false statements to a financial institution, conspiracy to commit bribery, bribery, mail fraud, wire fraud, bank fraud, falsification of records, money laundering conspiracy and money laundering. The recorded conversation at issue relates to an alleged bribery scheme involving Fattah and Vederman and specifically to four counts of the indictment charging Fattah, Vederman and Bowser with bank fraud (18 U.S.C. § 1344), false statements to a financial institution (18 U.S.C. § 1014), falsification of records (18 U.S.C. § 1519), money laundering (18 U.S.C. § 1957), and money laundering conspiracy (18 U.S.C. § 1956(h)). The Government maintains in essence that the alleged sale to Vederman of a Porsche owned by Chenault-Fattah for $18,000 in January 2012 was a sham and in reality constituted a bribe paid by Vederman to Fattah.

According to the evidence, in January 2012 Fattah and his wife were in the process of purchasing a vacation home in the Poconos and needed additional funds to complete the transaction. On January 13, 2012, in response to the offer of Chenault-Fattah to sell to him the Porsche for $18,000, Vederman wired $18,000 into Fattah's Congressional Federal Credit Union account. On January 17, the Credit Union Mortgage Association ("CUMA"), from which the Fattahs were seeking a mortgage on the vacation home, requested that Fattah advise it of the source of the $18,000 and supply supporting documentation. Fattah replied that the money was from the sale of a Porsche he and his wife owned. Fattah thereafter forwarded to CUMA a bill of sale for the Porsche signed by Chenault-Fattah as the seller and Vederman as the buyer, and dated January 16, 2012. He also sent the car title showing the transfer of ownership from Chenault-Fattah to Vederman. Shortly thereafter, CUMA approved the mortgage. On January 24, 2012, Fattah wired $25,000 from his Congressional Federal Credit Union account to an escrow attorney for the purchase of the home.

As noted above, the Government charges that the sale of the car was a sham and that the representations made by Fattah and his wife to CUMA as to the sale of the Porsche as the source of the $18,000 were false. The Government maintains that the $18,000 was in fact a bribe to Fattah in return for Fattah's efforts to obtain an ambassadorship for Vederman and in return for Fattah's hiring of Vederman's girlfriend as a member of Fattah's Congressional staff in Philadelphia.

In support, the Government has produced evidence at trial that Fattah and his wife maintained possession, custody, and control of the Porsche long after the purported sale to Vederman in January 2012. The record shows that Chenault-Fattah renewed the registration of the Porsche in her name in mid-2012. She periodically changed the insurance coverage and regularly paid the insurance premiums on the car in 2012 and 2013 after the alleged sale took place. The Fattahs were still keeping the Porsche in the garage of their family

home in March 2014, some twenty-six months after the purported sale. There is additional evidence that subsequent to the alleged sale the Porsche had been driven and that Chenault-Fattah in June 2012 paid $1575 to have it serviced at a Porsche dealership. Finally, the Pennsylvania Department of Transportation has no record that the car was ever registered in the name of Vederman.

The recorded telephone conversation, which was the subject of the Government's motion to admit, took place between Chenault-Fattah and a representative of her automobile insurance company on November 30, 2012. This was over ten months after the alleged transfer of the Porsche to Vederman. The relevant portions of the recording are as follows:

A [1]: Thank you for calling the Hartford. My name is April. Are you calling to make changes or have questions on your auto policy today?

. . .

PE [2]: Great thank you, now I had I had one other request.

A: (UI).

PE: We actually have three I guess three cars insured.

A: Okay,

PE: Um, there's a my husband's a GMC, mine the Ford and then we have the Porsche which we take off the insurance during the ah winter because we have it just in the garage. Could I go ahead and and do that now or do I have to make a separate call on that?

A: No you can take care of it now.

PE: Okay, great. Can, um, excuse me maybe effective like Monday look like that would be December 3?

A: Certainly, just bear with me one moment take care of that for you right now.

PE: Thank you.

A: You're welcome. (waiting) I'm just gonna place you on hold briefly while I take care of that for you, okay?

PE: Okay, Thank you.

A: Thank you. (waiting) Thank you so much for holding.

PE: Sure.

A: I do appreciate your patience. I'm taking care of this right now for you. So okay I will be removing your bodily injury coverage, your property damage, your uninsured motorist, your under insured motorist. I'll be taking off your personal entry protection and I'll be taking off your collision coverage, leaving you with a $1,000 comprehensive deductible for any fire, theft, vandalism other related damage of last claims.

PE: Okay, very good.

A: Okay. I'm done just yet

PE: Oh but now it's still covered I mean it'll be in the garage. So let's say the garage collapses and destroys the car. It's it still has coverage, correct?

A: Correct you're covered for any, yes you have coverage for while it's still sitting.

PE: Okay, perfect and that coverage is in the amount of . .

A: You have a $1000 comprehensive deductible.

PE: Okay, okay so I have to pay a $1000 and then and that's my deductible and whatever. .

A: Correct.

PE: Right, okay terrific terrific.

---

1. "A" is the Hartford insurance company representative.

2. "PE" is Renee Chenault-Fattah.

A: And I'm also removing your $75 towing reimbursement as well.

PE: Okay, um hum.

A: Sorry about the silence.

PE: That's okay.

A: This is gonna be also effective as of December 3.

PE: Okay, terrific.

A: Okay just to confirm we took off all your liability coverage and the $1000 comprehensive deductible. I mean the $1000 collision deductible leaving you with a $1000 comprehensive deductible. So you are aware that you can't drive the car for a least 30 days and you need to give us a 24 hour notice to add coverage back on to the vehicle.

PE: Absolutely, okay thank you very much.

A: And you will get the (UI) in the mail. It's a 7-10 mailing days. Now that brought your premium down to $5,147.00 for the year. That's a difference of $1,313.00. Let me just take a quick look at your billing for you ... (waiting) If you don't mine holding I can contact that billing department to see what your monthly payment is now going to be.

PE: Um you know what I actually have to run whatever it is it sounds like it's gonna be reduction so it'll be good.

A: Okay.

PE: Okay.

A: .. and also just to let you know you will receive a letter in the mail confirming that you still will have comprehensive coverage on the vehicle and you'll get in the mail 7-10 mailing days.

PE: Okay, thank you so much for your help.

... 

The Government advanced a multifaceted argument in support of admissibility. First, it contended that Chenault-Fattah's statements about possession, garaging, and insurance coverage for the Porsche were simply being introduced for the fact that the statements were made and not for the truth of their content. The Government called the conversation a "performative utterance." See United States v. Montana, 199 F.3d 947 (7th Cir.1999). The Government maintained in the alternative that the statements are admissible even if they are hearsay as statements against Chenault-Fattah's penal interest under Rule 804(b)(3) of the Federal Rules of Evidence or as statements of intent under Rule 803(3). The defendants countered that the statements are relevant only for their truth and are inadmissible hearsay.

We agree with defendants that the Government seeks to introduce the statements for their truth that the Fattahs still possessed the Porsche, were keeping it in their garage, and were continuing to insure it as of late November 2012 when the recorded call occurred. The statements support the Government's position that the January 2012 sale to Vederman was a sham. We can discern no other purpose for seeking to present this evidence before the jury. United States v. Reynolds, 715 F.2d 99, 102–03 (3d Cir.1983). Thus, we turn to the issue of hearsay.

Rule 801(c) provides that " 'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."[3] Unless otherwise allowed, hearsay is inadmissible. See Fed. R. Evid. 802.

---

**3.** There are certain statements that meet this definition but are not hearsay. See Fed. R. Evid. 801(d). Statements of this kind are not relevant here.

Rule 804(b)(3) provides for an exception to the inadmissibility of hearsay when the declarant is not available and a statement is against the declarant's penal interest. A statement against penal interest is one that:

(A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

(B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

As the Supreme Court observed in <u>Williamson v. United States</u>,

■ [t]he question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," and this question can only be answered in light of all of the surrounding circumstances.

512 U.S. 594, 604, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (quoting Fed. R. Evid. 804(b)(3)).

■ The statements of Chenault-Fattah concerning the possession of the Porsche, the keeping of it in the family garage, and the change in the insurance coverage for it in November 2012 are in our view statements against her penal interest. These statements contradict her prior statements to the mortgage company that the Porsche was sold to Vederman in January 2012. She signed documentation certifying that the Porsche was sold to Vederman in January 2012, and the documentation was forwarded to CUMA. Both Chenault-Fattah and Fattah acknowledged to CUMA that "false statements or facts provided knowingly for the purpose of obtaining a mortgage loan is a federal crime punishable by fine or imprisonment or both as applicable under the provisions of Title 18 United States Code, Section 1014." Thereafter, the Fattahs were approved for the mortgage for the Pocono vacation home. If the mortgage company had known the $18,000 did not come from the bona fide sale of the Porsche, Fattah and his wife would not have been approved for the mortgage.

Chenault-Fattah's statements to her insurance company "would have been made only if ... [she] believed [them] to be true ... because [they] had so great a tendency ... to expose [her] ... to ... criminal liability" under § 1014. We also conclude that for the same reasons her statements had a great tendency to expose her to liability for bank fraud under 18 U.S.C. § 1344 and falsifying documents under 18 U.S.C. § 1519.

The defendants argue that Chenault-Fattah's statement that she keeps the car in her garage is consistent with innocence. We acknowledge that in and of itself there is nothing inculpatory about housing an automobile in the family garage. Nonetheless, there is much more to the story than that. See <u>Williamson</u>, 512 U.S. at 603–04, 114 S.Ct. 2431 (1994). According to the recording, she stated, "we have the Porsche which we take off the insurance during the ah winter because we have it just in the garage." This can hardly be construed as an innocuous comment since Chenault-Fattah in effect is telling the insurance company that she still owned the Porsche when there is evidence in the record that she had represented to a mortgage company that she had sold the car and received $18,000 for it some ten months earlier. Moreover, other activities of Chenault-Fattah with respect to the car after the alleged sale, such as continuing to

insure it, renewing the registration, driving and servicing it, and keeping it in the family garage, confirm the court's analysis.

The "surrounding circumstances" lead us to reject the defendants' argument that Chenault-Fattah's statements are not inculpatory. See id. at 606, 114 S.Ct. 2431. To the contrary, they are against her penal interest. In addition, we conclude that the "corroborating circumstances" clearly indicate the trustworthiness of Chenault-Fattah's statements. See Fed. R. Evid. 804(b)(3)(B). A reasonable person would only have made her statements to the insurance company if she believed them to be true. Finally, Chenault-Fattah, the declarant, is unavailable as a witness. See Fed. R. Evid. 804(a). Accordingly, the court has granted the Government's motion in limine and admitted into evidence the November 30, 2012 recorded telephone conversation between Chenault-Fattah and the insurance company representative because it meets the requirements for admissibility under Rule 804(3)(b) of the Federal Rules of Evidence.[4]

---

**4.** Since we have concluded that the recordings constitute statements against penal interest under Rule 804(b)(3), we need not assess whether the Government is correct that they are also statements of intent under Rule 803(3).